Moira Heiges-Goepfert (Cal. Bar No. 326861)
OUTTEN & GOLDEN LLP
One California Street, 12th Floor
San Francisco, CA 94111
New York, NY 10017
Telephone: (212) 245-1000
Facsimile:  (415) 638-8810
mhg@outtengolden.com

Mikael Rojas (Cal. Bar No. 309626)
OUTTEN & GOLDEN LLP
601 Massachusetts Avenue NW, Suite 200W
Washington, D.C. 20001
Telephone: (202) 847-4400
Facsimile 646) 509-2008
mrojas@outtengolden.com

Ossai Miazad (admitted *pro hac vice*)
Michael Litrownik (admitted *pro hac vice*)
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone:  (212) 245-1000
Facsimile: (646) 509-2060
om@outtengolden.com
mlitrownik@outtengolden.com

*Pro hac vice* application forthcoming
*Attorneys for Plaintiff and the Proposed Class*

Ivan Espinoza-Madrigal*
Oren Nimni*
LAWYERS FOR CIVIL RIGHTS
61 Batterymarch Street, 5th Floor
Boston, MA 02110
Telephone: (617) 482-1145
Facsimile: (617) 482-4392
iespinoza@lawyersforcivilrights.org
onimni@lawyersforcivilrights.org

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUBEN JUAREZ and CALIN CONSTANTIN SEGARCEANU, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>      v.<br><br>SOCIAL FINANCE, INC. d/b/a SOFI, and SOFI LENDING CORP. d/b/a SOFI,<br><br>        Defendants. | Case No. 4:20-cv-03386-HSG<br><br>Hon. Haywood S. Gilliam<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF 42 U.S.C. § 1981, CALIFORNIA STATE LAW, AND THE FAIR CREDIT REPORTING ACT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Ruben Juarez ("Juarez") and Calin Constantin Segarceanu ("Segarceanu"), on behalf of themselves and all others similarly situated, by their attorneys, bring the following allegations against Defendants Social Finance Inc. and SoFi Lending Corp. (together "SoFi" or "Defendants"):

## SUMMARY OF CLAIM

### *Discriminatory Lending*

1. Plaintiffs bring this case against SoFi for unlawful lending discrimination in violation of the Civil Rights Act of 1866, as codified by 42 U.S.C. § 1981 ("Section 1981") and the California Unruh Civil Rights Act, as codified by California Civil Code §§ 51, *et seq.* ("Unruh Act"); and for obtaining consumer reports without a permissible purpose for doing so in violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA").

2. SoFi is in the business of marketing, offering and extending a variety of financial services and credit products to consumers. As a lender, SoFi originates student loans, personal loans, and home mortgage and improvement loans, refinances student loans, and offers credit card consolidation (collectively, "Loans").

3. SoFi's lending policies and practices have required applicants who were not U.S. citizens to be either lawful permanent residents ("LPRs") or holders of certain U.S. visas (E-2, E-3, H-1B, J-1, L-1, or O-1) to be eligible for Loans.

4. Since 2012, and continuing through early-December 2019, SoFi's lending policies and practices have made non-citizen applicants who resided in the United States and held Deferred Action for Childhood Arrivals ("DACA"), which granted them federal work authorization and Social Security numbers ("SSNs"), ineligible for Loans. Because DACA recipients are neither LPRs nor visa-holders, they were ineligible for Loans under SoFi's policies.

5. In early-December 2019, SoFi made DACA recipients eligible for Loans, but only if they apply by telephone and only with a co-signer who is a U.S. citizen or LPR—two requirements that are not imposed on applicants who are U.S. citizens, LPRs, or visa-holders.

6. Throughout the relevant time period, SoFi has also had a policy and practice of making permanent residents whose green cards have a validity period (from issuance to expiry) of two years or

FIRST AMENDED COMPLAINT FOR VIOLATIONS
OF SECTION 1981, CA STATE LAW AND FCRA
Case No. 4:20-cv-03386

less, such as holders of conditional green cards ("Conditional Permanent Residents") ineligible for Loans.

7.      SoFi's policy and practice of (a) denying DACA recipients the right to contract for credit because they were not U.S. citizens, LPRs, or holders of certain visas before early-December 2019, (b) denying DACA recipients the right to contract for credit unless they apply by telephone and have a U.S. citizen or LPR co-signer after early-December 2019, and (c) denying Conditional Permanent Residents the right to contract for credit because they are not U.S. citizens or LPRs constitutes unlawful alienage discrimination under Section 1981 and unlawful alienage and immigration status discrimination under Sections 51(b) and 51.5 of the Unruh Act.

### *FCRA Violations*

8.      Even though it treats Conditional Permanent Resident applicants as automatically ineligible for Loans, SoFi nonetheless obtains their consumer reports in violation of the FCRA, thereby invading their privacy and damaging their credit scores.

9.      When permanent residents apply for Loans through SoFi's website, SoFi collects their personal information, including names, addresses, and phone numbers, and requires them to provide SoFi with photocopies of their green cards.  At that point in the application process, SoFi knows which permanent residents are automatically ineligible for Loans, such as Conditional Permanent Residents, because their green cards have a validity period (from issuance to expiry) of two years or less.

10.     Despite that knowledge, SoFi obtains Conditional Permanent Resident applicants' consumer credit reports without any intention of using the information in the report to determine their eligibility for credit.

11.      SoFi takes no steps to ensure that it does not impermissibly pull Conditional Permanents Residents' consumer reports.  During the online application process, SoFi does not create filters to screen out Conditional Permanent Residents or otherwise notify them that they are ineligible for Loans. For example, when permanent residents are asked to provide a photocopy of their green card, SoFi does not inform them that holders of a conditional green card—i.e., a green card with a validity period of two years or less—are not eligible for SoFi Loans.

12.     As a result, SoFi obtains consumer reports for Conditional Permanent Resident applicants, including Plaintiff Segarceanu, even though it has no intention of using the information contained within the report to assess their eligibility for credit.  Because SoFi knows its application process will cause it to impermissibly obtain Conditional Permanent Residents' consumer reports but does not take adequate steps to avoid that result, it has acted willfully or recklessly.

**PARTIES**

### Plaintiff Ruben Juarez

13.     Plaintiff Ruben Juarez is a non-U.S. citizen residing in the State of New York.

14.     Mr. Juarez has had DACA, federal work authorization, and a valid SSN since November 2, 2012.

### Plaintiff Calin Constantin Segarceanu

15.     Mr. Segarceanu is a non-U.S. citizen residing in the State of Illinois.

16.     Mr. Segarceanu has held a valid SSN since 2015, and a conditional green card since September 11, 2019, following his marriage to his wife, a U.S. citizen, in October 2018.  In June 2021, Mr. Segarceanu will be eligible to apply to extend his green card, which would otherwise expire on September 11, 2021.  Pursuant to his SSN and conditional green card, Mr. Segarceanu is legally authorized to work in the United States.

### Defendants

17.     Defendant Social Finance, Inc., also doing business as SoFi, is a Delaware corporation with its principal office or place of business at 234 First Street, San Francisco, CA 94105.

18.     Defendant SoFi Lending Corp., also doing business as SoFi, is a California corporation with its principal office or place of business at 234 First Street, San Francisco, CA 94105.  SoFi Lending Corp. is a wholly owned subsidiary of Defendant Social Finance, Inc.

19.     Together, Defendants are in the business of marketing, offering, and extending a variety of financial services and Loans to consumers.

20.     Defendants, by soliciting, conducting, and transacting business in the state of California, engage in continuous, permanent, and substantial activity within the state.

21.     Defendants are not federal enclaves and therefore are subject to Plaintiffs' Section 1981 claim.

**JURISDICTION AND VENUE**

22.     This Court has subject matter jurisdiction over Plaintiffs' Section 1981 and FCRA claims pursuant to 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over Plaintiffs' Unruh Act claim pursuant to 28 U.S.C. § 1367.

23.     This Court has personal jurisdiction over SoFi.  There is general jurisdiction over SoFi, as SoFi's corporate headquarters are located in this District, SoFi conducts substantial business throughout this District and in the State of California, and SoFi employs hundreds of workers in the State of California.  SoFi has consented to this Court asserting personal jurisdiction over SoFi, as SoFi's Terms of Use require SoFi and its users to "submit to the personal and exclusive jurisdiction and venue of the state and federal courts within San Francisco County, California."[1]

24.     This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because SoFi resides in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

26.     Venue is also proper because SoFi's Terms of Use require SoFi and its users to submit to the venue of the state and federal courts located in this District.  The same Terms of Use also state that the "Terms of Use and the License [to use the SoFi App] shall be governed in all respects by the substantive laws of the State of California, without regard to its provisions relating to conflict of law."[2]

27.     Intradistrict assignment:  Pursuant to N.D. Cal. Local Rules 3-2(c) and (d), intradistrict assignment to the San Francisco Division is proper because a substantial part of the events which give rise to the claims asserted herein occurred at SoFi's headquarters located in San Francisco County.

---

[1]   SoFi, Terms of Service, *available at* https://www.sofi.com/terms-of-use/ (last visited July 27, 2020).
[2]   *Id.*

# BACKGROUND

## *DACA*

28.    On June 15, 2012, President Barack Obama announced that the Department of Homeland Security ("DHS") would no longer remove certain young immigrants under its authority to grant deferred action as embodied in DACA.

29.    DACA's purpose, according to President Obama, was to "[stop] expel[ling] talented young people, who . . . [have] been raised as Americans; understand themselves to be part of this country . . . [and] who want to staff our labs, or start new businesses, or defend our country."[3]

30.    DACA is a form of deferred action against removal, a discretionary grant of authorized stay by the federal government.  Deferred action granted through DACA is valid for two years and is subject to renewal thereafter by the United States Citizenship and Immigrations Services ("USCIS") within DHS.

31.    To be eligible for DACA, individuals must meet: (a) age and residency requirements (*i.e.*, have arrived to the United States as minors under the age of sixteen, continuously resided in the United States for five years preceding June 15, 2012, and not be above the age of thirty at the time of application); (b) educational or military service requirements (*i.e.*, high school degree or equivalent, or honorable service in the Coast Guard or Armed Forces); (c) criminal history requirements (*i.e.*, no felony or significant misdemeanor convictions, no series of minor misdemeanor offenses); and (d) not "otherwise pose[] a threat to national security or public safety[.]"[4]

32.    DACA provides that persons who are granted deferred action will be eligible to obtain an Employment Authorization Document (an "EAD" or "federal work authorization") and an SSN.  In other words, those granted deferred action and in possession of an EAD are legally authorized to work

---

[3]    President Obama, Remarks by the President on Immigration (June 15, 2012), *available at* http://www.whitehouse.gov/the-press-office/2012/06/15/remarks-president-immigration(last visited July 27, 2020).
[4]    DHS, Exercising Prosecutorial Discretion with Respect to Individuals who Came to the United States as Children, June 15, 2012, *available at* https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf (last visited July 27, 2020).

FIRST AMENDED COMPLAINT FOR VIOLATIONS
OF SECTION 1981, CA STATE LAW AND FCRA
Case No. 4:20-cv-03386

in the United States and can prove their identity.

33.     As of December 31, 2019, USCIS had approved approximately 2.6 million initial and renewal requests for DACA.[5]

34.     As of April 2020, it has been estimated that over 200,000 DACA recipients are working on the frontlines in the response to the COVID-19 pandemic as "essential critical infrastructure workers" as defined by DHS.[6]  An estimated 29,000 DACA recipients are health care workers, including 8,600 in California.[7]  There are an estimated 142,100 DACA recipients who work in food-related occupations or industries, including roughly 12,800 employed in the farming and agriculture industry, 11,600 employed in food manufacturing and processing roles, and 8,800 who work in food warehousing, transportation, and delivery.[8]  Another approximately 14,900 are employed in roles helping keep grocery stores open and operable.[9]

35.     On June 18, 2020, the United States Supreme Court held in *Department of Homeland Security. v. Regents of the University of California*, 140 S. Ct. 1891 (2020) that, after a change in presidential administrations in 2017, the federal government failed to provide legally sufficient reasons for ending the DACA program under the Administrative Procedure Act, and that DACA would continue in effect.  The Supreme Court noted, *inter alia*, that work authorization for DACA recipients is "permitted under regulations long predating DACA's creation" and further that DACA recipients are

---

[5]     USCIS, Number of I-821D, Consideration of Deferred Action for Childhood Arrivals by Fiscal Year, Quarter, Intake, Biometrics and Case Status: 2012-2019, *available at* https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/DACA_performancedata_fy2020_qtr1.pdf (last visited July 27, 2020).

[6]     *See* Nicole Prchal Svajlenka, "A Demographic Profile of DACA Recipients on the Frontlines of the Coronavirus Response," Center for American Progress, Apr. 6, 2020, *available at* https://www.americanprogress.org/issues/immigration/news/2020/04/06/482708/demographic-profile-daca-recipients-frontlines-coronavirus-response/ (last visited July 27, 2020); DHS, Guidance on the Essential Critical Infrastructure Workforce, Mar. 19, 2020 (revised June 18, 2020), *available at* https://www.cisa.gov/publication/guidance-essential-critical-infrastructure-workforce (last visited July 27, 2020).

[7]     *Id.*

[8]     *Id.*

[9]     *Id.*

FIRST AMENDED COMPLAINT FOR VIOLATIONS
OF SECTION 1981, CA STATE LAW AND FCRA
Case No. 4:20-cv-03386

"lawfully present" in the United States "for purposes of, and therefore eligible to receive, Social Security and Medicare benefits." *Id.* at 1902.

### Conditional Permanent Residence

36.     USCIS grants conditional green cards to eligible individuals whose permanent residency is based upon marriage to a U.S. citizen or LPR, where the marriage has been in effect for less than two years.[10]

37.     Conditional permanent residence is a type of permanent residence, and Conditional Permanent Residents are entitled to essentially the same rights and benefits as other LPRs including lawful residence, work authorization, and travel privileges.[11]

38.     Conditional green cards are valid for a period of two years and can be extended by filing a Form I-751 ("Petition to Remove Conditions on Residence") within 90 days of expiration.[12]  After filing a successful Form I-751, the conditional green card holder will receive a "permanent" green card that is typically valid for 10 years and is subject to renewal.[13]

### Federal Requirements for Lending

39.     There is no federal or state law or regulation that restricts banks from providing financial products, including Loans, to customers because the customer is an alien.  Under federal law, alienage is merely one factor among many used to verify enough information to confirm the true identity of the customer.

40.     For instance, the Federal Financial Institutions Examination Council ("FFIEC") provides uniform principles and standards to offer guidance for federal regulators.  The FFIEC annually publishes the Bank Secrecy Act/Anti-Money Laundering Examination Manual for Money Services, which

---

[10]     USCIS, "Conditional Permanent Residence," *available at* https://www.uscis.gov/green-card/after-we-grant-your-green-card/conditional-permanent-residence (last visited July 27, 2020).
[11]     USCIS, "After We Grant Your Green Card," *available at* https://www.uscis.gov/green-card/after-we-grant-your-green-card (July 27, 2020).
[12]     USCIS, "Conditional Permanent Residence," *available at* https://www.uscis.gov/green-card/after-we-grant-your-green-card/conditional-permanent-residence (last visited July 27, 2020).
[13]     USCIS, "Renew or Replace my Green Card," *available at* https://my.uscis.gov/exploremyoptions/renew_green_card (last visited July 27, 2020).

contains a compliance program called the Customer Identification Program ("CIP"), as required by section 326 of the USA PATRIOT Act, 31 U.S.C. § 5318.  Pursuant to CIP, institutions providing financial services, including banks, must have a written policy in place to enable them to form a reasonable belief that they know the true identity of each customer.  The goal behind this requirement is to prevent the funding of terrorism both inside and outside of the United States.[14]

41.    According to the Bank Secrecy Act/Anti-Money Laundering Examination Manual, a bank's CIP must contain account-opening procedures detailing the identifying information that must be obtained from each customer.  At a minimum, the bank must obtain the following information from each customer before opening an account: (a) name, (b) date of birth, (c) address, and (d) identification number (*e.g.*, Social Security number, taxpayer identification number, or an alien identification number).[15]

42.    The bank's procedure must also describe when it will use documents, non-documentary methods, or a combination of both.  Federal banking agencies expect that banks will review an unexpired government-issued form of identification from most customers.  The identification must include evidence of the customer's nationality or residence and bear a photograph or similar safeguard.[16]

43.    Compliance with the CIP is to ensure that a bank verifies enough information to form a reasonable belief that it knows the true identity of the customer.[17]

44.    "Opening an account" and a financial services "customer" for purposes of the Bank Secrecy Act/Anti Money Laundering Examination Manual for Money Services includes an individual who has applied for a loan.[18]

---

[14]    *See* 12 C.F.R. 208.63(b), 211.5(m), 211.24(j) (Board of Governors of the Federal Reserve System); 12 C.F.R. 326.8(b) (Federal Deposit Insurance Corporation); 12 C.F.R. 748.2(b) (National Credit Union Administration); 12 C.F.R. 21.21 (Office of the Comptroller of the Currency); 12 C.F.R. 563.177(b) (Office of Thrift Supervision); and 31 C.F.R. 103.121 (FinCEN).

[15]    Fed. Fin. Inst. Examination Council, Bank Secrecy Act/Anti-Money Laundering Examination Manual (2014) at 48-49, *available at* https://bsaaml.ffiec.gov/docs/manual/06_AssessingComplianceWithBSARegulatoryRequirements/01.pdf (last visited July 27, 2020).

[16]    *Id.* at 49.

[17]    *Id.*

[18]    *Id.* at 47-48.

***The FCRA'S Privacy Protections***

45.     Congress enacted the FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy.

46.     To protect privacy, the FCRA prohibits users, like SoFi, from obtaining consumer reports unless the user has a permissible purpose for procuring the report, as defined in the statute.  Specifically, the FCRA, 15 U.S.C. § 1681b(f), provides:

> A person shall not use or obtain a consumer report for any purpose unless (1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section; and (2) the purpose is certified in accordance with section 1681e of this title by a prospective user of the report through a general or specific certification.

47.     The FCRA defines a closed list of permissible purposes for the use of a consumer report. *Id.* § 1681b(a).  One permissible purpose for obtaining a credit report is where the requestor "intends to use the information in connection with a credit transaction involving he consumer . . . ."  *Id.* § 1681b(a)(3)(A).

48.     The FCRA also contains a catch-all "legitimate business purpose" clause in the event that the enumerated circumstances in § 1681b(a)(3)(A)-(E) do not apply.  *Id.* § 1681b(a)(3)(F)(i).

49.     The "legitimate business purpose" carve-out requires a "legitimate business need" for the consumer report, "in connection with a business transaction that is initiated by the consumer."  *Id.*

50.     The Federal Trade Commission ("FTC") has provided a wealth of guidance interpreting these provisions of the FCRA, including confirming the position that a request for and use of a consumer report must be governed by a *reasonable relation* to the underlying transaction:

> Under this subsection, a party has a permissible purpose to obtain a consumer report on a consumer for use in connection with some action the consumer takes *from which he or she might expect to receive a benefit* that is not more specifically covered by subsections (A), (B), or (C). For example, a consumer report may be obtained on a consumer who applies to rent an apartment, offers to pay for goods with a check, applies for a checking account or similar service, seeks to be included in a computer

dating service, or who has sought and received overpayments of government benefits that he has refused to return.[19]

51.     The FTC has also described the outer bounds of a "legitimate business need":

[T]he *only permissible purpose for which a credit report may be obtained* in connection with a new business transaction is to determine the consumer's "eligibility"—i.e., whether the business wishes to undertake a transaction with the consumer. In this regard, we note that the legislative history indicates that Congress intended the "permissible purposes" provisions of the FCRA to cover primarily "eligibility issues" (*see, e.g.*, 116 Cong. Rec. 36,572 (statement of Rep. Sullivan)).[20]

### Hard and Soft Credit Pulls

52.     Inquiries related to transactions initiated by a consumer are known colloquially as "hard inquiries" or "hard pulls."  Inquires not related to transactions initiated by the consumer are known as "soft inquiries" or "soft pulls."

53.     Hard pulls are visible to third parties who obtain a consumer credit report.  Soft pulls are not.

54.     Each hard pull can result in a reduction of a credit score by up to five points.[21]

55.     Creditors often use the number of hard inquiries on a consumer's credit report as a basis to deny an extension of credit.

56.     A "soft pull," by contrast, is a credit inquiry that is not visible to anyone other than the consumer, and that does not affect the consumer's credit score.  Soft pulls include inquiries made when a consumer checks their own credit report, inquiries made by businesses with which the consumer already does business, such as a mortgage servicer reviewing the status of the consumer's account, and inquiries made by creditors to make firm offers of credit even where no transaction has been initiated by

---

[19]     16 C.F.R. c. 1, Pt. 600 App. (emphasis added).
[20]     FTC Informal Staff Opinion Letter, William Haynes (Mar. 2, 1998) (emphasis added); *see also* FTC Informal Staff Opinion Letter, David Medine (Feb. 11, 1998).
[21]     *See Harkins v. Diversified Collection Servs., Inc.*, No. 12 Civ. 1229, 2012 WL 5928997, at *1 n.1 (D. Md. Nov. 26, 2012).

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF SECTION 1981, CA STATE LAW AND FCRA
Case No. 4:20-cv-03386

a consumer.[22]

57.     A soft pull is not visible to other users and does not affect a consumer's credit score.[23]

**STATEMENT OF FACTS**

*Plaintiff Juarez*

58.     Mr. Juarez is 31 years-old and has lived in the United States since he was a ten year-old child, having been brought to the United States in or around September 1999.  He currently resides in the State of New York.  Mr. Juarez was born in Mexico and is a Mexican national.

59.     On October 25, 2012, Mr. Juarez obtained DACA.  Around the same time, Mr. Juarez obtained an EAD, and on November 2, 2012, he received an SSN.

60.     From approximately September 2010 through approximately May 2014, Mr. Juarez attended Lehman College of the City University of New York, where he earned a Bachelor of Science degree in Accounting.  Mr. Juarez incurred substantial expenses for tuition and other required materials as an undergraduate student.

61.     From approximately September 2014 through approximately February 2016, Mr. Juarez attended the Gabelli School of Business at Fordham University, where he earned a Master of Science degree in Global Finance.  Mr. Juarez incurred substantial expenses for tuition and required materials as a Master's student at Fordham University.

62.     Following his graduation from his Master's program in February 2016, Mr. Juarez secured a full-time job as an Analyst at JPMorgan Chase & Co. in New York City.  Mr. Juarez has worked at several other financial and investment firms, including Edwards Jones and T3 Trading Group.  Mr. Juarez is currently employed by Macro Consultants, LLC as a Consultant in its Strategic Advisory Services Group.

---

[22]     Fair Isaac Corporation, "Credit Checks: What are Credit Inquiries and How do they Affect Your FICO Score?," *available at* https://www.myfico.com/credit-education/credit-reports/credit-checks-and-inquiries (last visited July 27, 2020).

[23]     *See* Consumerist, "Hard and Soft Credit Inquiries, and How One Hurts Your Credit Score." https://consumerist.com/2008/12/06/hard-and-soft-credit-inquiries-and-how-one-hurts-your-credit-score/ (last visited Jan. 17, 2020).

63.     In order to finance his education, Mr. Juarez obtained private student loans.  Unlike other students who have a financial need, DACA recipients are categorically ineligible for federal financial aid, including need-based grants and loans for which interest payments are subsidized by the government, and therefore disproportionately rely on private lenders to fund their education.[24]

64.     On approximately August 1, 2014, Mr. Juarez obtained a private student loan in the amount of $40,000 from Discover Bank with the help of a U.S. citizen family member who acted as a co-signer.  The loan had a fixed interest rate of 8.6%.

65.     In 2016, Mr. Juarez began to receive promotional material from SoFi offering student loan refinancing and related services.  SoFi offered refinancing at low interest rates, such as 3-4%.

66.     Mr. Juarez sought refinancing for his student loan because the 8.6% interest rate he was paying was higher than the rates SoFi was offering.

67.     In approximately November 2016, Mr. Juarez first sought to refinance his student loan debt with SoFi.  At the time, Mr. Juarez had approximately $38,000 in student loan debt.

68.     Mr. Juarez visited SoFi's website to begin the process.  After providing certain required information, such as his name and email address, the SoFi website prompted Mr. Juarez to indicate whether he was a U.S. citizen, LPR, or visa-holder.  Mr. Juarez does not recall being presented with or agreeing to SoFi's Dispute Resolution Agreement.  Because Mr. Juarez is not a U.S. citizen, LPR, or visa-holder, SoFi's online application process did not allow him to complete and submit his application to refinance his student loans.  As a result, Mr. Juarez was denied the ability to contract for student loan refinancing with SoFi.

69.     Mr. Juarez continued to receive student loan refinancing offers from SoFi through 2017, 2018, and 2019 promoting interest rates as low as 3%.

70.     On several other occasions in 2017, 2018, and 2019, Mr. Juarez attempted to apply for

---

[24]     DACA recipients are also ineligible for additional federal protections in student lending, such as the government's suspension of all federal student loan payments and interest from March 27, 2020 through September 30, 2020 due to the pandemic.  *See* U.S. Department of Education, "Coronavirus and Forbearance Info for Students, Borrowers, and Parents," *available at* https://studentaid.gov/announcements-events/coronavirus (last accessed July 29, 2020).

student loan refinancing, either by calling SoFi's customer service number or initiating an online application in hopes that SoFi had changed its eligibility policy for DACA recipients. Specifically, Mr. Juarez attempted to apply to SoFi to refinance his student loans on or around June 13, 2017, December 8, 2018, and late-July 2019. On each of these occasions, Mr. Juarez was denied an opportunity to contract for student loan refinancing with SoFi.

71.     On or around on June 13, 2017, Mr. Juarez called SoFi's customer service number to inquire as to whether SoFi had changed its eligibility policy for DACA recipients after reviewing SoFi's website. At that time, Mr. Juarez does not recall entering any information on SoFi's website in connection with his call. A SoFi customer service representative told Mr. Juarez that DACA recipients were not eligible for student loan refinancing under SoFi's policies.

72.     Approximately one and a half years later, on or around December 8, 2018, Mr. Juarez again called SoFi's customer service number to inquire as to whether SoFi had changed its eligibility policy for DACA recipients after reviewing SoFi's website. At that time, Mr. Juarez does not recall entering any information on SoFi's website in connection with his call. Again, a SoFi customer service representative informed Mr. Juarez that DACA recipients were still ineligible for student loan refinancing.

73.     Mr. Juarez does not recall and does not believe that he was presented with or agreed to SoFi's Dispute Resolution Agreement on SoFi's website or through his telephone discussions with SoFi's customer service representatives in either June 2017 or December 2018.

74.     Approximately eight months later, in or around late-July 2019, Mr. Juarez again reviewed SoFi's website and attempted to submit an online application for student loan refinancing. Mr. Juarez was unable to complete SoFi's online application, however, because he was not a U.S. citizen, LPR, or visa-holder. Thus, SoFi rejected Mr. Juarez automatically because he was not a U.S. citizen or LPR.

75.     To the best of his recollection, when he visited SoFi's website in or around late-July 2019, Mr. Juarez did not register for a SoFi account, nor was he able to submit information or finalize an application for student loan refinancing. Mr. Juarez does not recall and does not believe that he was

presented with or agreed to SoFi's Dispute Resolution Agreement on that date in or around late-July 2019.

76.     On November 18, 2019, Mr. Juarez sent SoFi a letter correspondence explaining that SoFi's policy of refusing to make DACA recipients eligible for Loans violated civil rights laws.

77.     On December 4, 2019, SoFi responded to Mr. Juarez's letter by changing its lending policies to make DACA recipients eligible for Loans so long as they apply by telephone with a creditworthy U.S. citizen or LPR co-signer.

78.     Mr. Juarez still has approximately $32,000 in student loan debt that he would like to refinance at a lower rate.  Although SoFi replaced its blanket ban against lending to DACA recipients in December 2019 to allow for lending to those with a creditworthy U.S. citizen or LPR co-signer, Mr. Juarez no longer has access to a qualifying co-signer.  Therefore, SoFi is still excluding Mr. Juarez from refinancing his student loans, despite his own excellent creditworthiness.

79.     Mr. Juarez has suffered harm as a result of SoFi's discriminatory policy and practice of making DACA recipients ineligible for loans on the same terms as U.S. citizens and LPRs.  Specifically, Sofi has denied Mr. Juarez the opportunity to contract for its advertised rates of 3-4%, boxing him into substantially higher interest rates of approximately 8.6%.  This is despite the fact that his income and credit score would have otherwise allowed him to qualify for SoFi's advertised rates.

***Plaintiff Segarceanu***

80.     Mr. Segarceanu is a Romanian national residing in the State of Illinois.  Mr. Segarceanu has lived in the United States since 2015, when immigrated to pursue higher education on an F-1 student visa.

81.     Mr. Segarceanu concurrently earned two degrees, a Bachelor of Science in Computer Science and a Master's degree in Data Science, from the Illinois Institute of Technology in December 2019.

82.     Mr. Segarceanu has been authorized to work in the United States since the fall of 2015, when he received a SSN.  He is currently employed as a software engineer for Amazon Web Services.

83.     Mr. Segarceanu owns two homes in the United States, and he has excellent credit.

84.     Mr. Segarceanu married his wife, a U.S. citizen, in October 2018, and thereafter applied for permanent residency.  On September 11, 2019, Mr. Segarceanu obtained a conditional green card with a validity period of two years and an expiration date of September 11, 2021.

85.     While reviewing his eligibility for certain credit products on a third-party website in early June 2020, Mr. Segarceanu received promotional materials suggesting that he was "preapproved" or otherwise eligible for SoFi loans, including for personal loans with interest rates as low as 9-10%.

86.     On or around June 3, 2020, Mr. Segarceanu visited SoFi's website to learn more about SoFi's student loan refinancing and personal loan products.  Mr. Segarceanu submitted his personal information on SoFi's website and began the application process but did not complete an application that day.

87.     On or around June 19, Mr. Segarceanu again visited SoFi's website in order to apply for a personal loan to refinance credit card debt at a lower interest rate.  Currently, Mr. Segarceanu and his wife have approximately $20,000 in credit card debt, with an interest rate of approximately 20%, which is substantially higher than the 10% interest rates advertised by SoFi.

88.     On or around June 19, Mr. Segarceanu completed SoFi's online application for a personal loan in the amount of $20,000.

89.     As part of SoFi's online application process, Mr. Segarceanu was asked whether he is a U.S. citizen, permanent resident or visa-holder.  Upon indicating that he is a permanent resident, SoFi's website prompted Mr. Segarceanu to upload a copy of the front and back of his green card.  Thereafter, Mr. Segarceanu uploaded a copy of his green card, showing a two-year validity period from the issuance date of September 11, 2019 to the expiration date of September 11, 2021.

90.     On June 19, shortly after receiving Mr. Segarceanu's online application and a copy of his green card, SoFi performed a "hard pull" of Mr. Segarceanu's credit report.  Mr. Segarceanu subsequently received a notification from Experian, a credit bureau that provides free monitoring, stating that SoFi had checked his credit report on June 19.

91.     Prior to puling Mr. Segarceanu's credit report, SoFi had actual knowledge of Mr. Segarceanu's green card expiration date, and therefore had actual knowledge that he was not eligible

under its lending policies.  Despite this knowledge, SoFi obtained his consumer report.  At no point in the application process did SoFi notify Mr. Segarceanu that holders of green cards with a validity period of two years or less cannot qualify for SoFi Loans.  Specifically, when Mr. Segarceanu noted that he was a "permanent resident" during the application process and provided a copy of his green card showing conditional permanent residence, SoFi *did not* inform him that Conditional Permanent Residents are not eligible to for Loans under SoFi's current policies.

92.     On June 20, SoFi emailed Mr. Segarceanu to confirm receipt of his loan application and request additional information.  In particular, SoFi requested that Mr. Segarceanu provide a copy of his Form I-751 ("Petition to Remove Conditions on Residence") as proof that he had applied for, or been granted, an extension of his green card.

93.     Mr. Segarceanu could not provide a completed copy of the Form I-751 because, per USCIS policy, his green card is not eligible for renewal, and he cannot file the Form I-751 until June 13, 2021, or 90 days prior to expiration.  Mr. Segarceanu contacted SoFi's customer service number on several occasions to try to explain that his green card was not yet eligible for renewal, but none of the customer service representatives with whom he spoke were able to address his concerns.

94.     On June 30, SoFi notified Mr. Segarceanu by email that his personal loan application had been denied.  As for the "reasons for [the] decline," SoFi merely listed "Other," (without specifying any particular grounds for rejection), while directing Mr. Segarceanu to call SoFi's credit services team for more information within 60 days.

95.     On June 30, Mr. Segarceanu called the number listed on his denial notification and eventually spoke with Danielle Cullen, an account specialist.  Over the phone, Ms. Cullen explained that SoFi had denied Mr. Segarceanu's application due to his status as Conditional Permanent Resident.  She said that SoFi's policy is to exclude Conditional Permanent Residents from loan eligibility because they may flee the country at any time, thus posing a credit risk that SoFi is not willing to bear.

96.     Sofi's rationale for excluding Conditional Permanent Residents was offensive and nonsensical given Mr. Segarceanu is married to a U.S. citizen, is the father of his U.S.-born daughter, was educated in the United States, works in the United States, has obtained and paid off loans in the

United States, and owns real property here.

97.     During the course of the call, Mr. Segarceanu asked if there were any exceptions to SoFi's blanket policy, and Ms. Cullen said there were not.  Notably, Ms. Cullen did not mention that Mr. Segarceanu would be eligible to apply for Loans at SoFi with a U.S. or other LPR co-signer.

98.     Also on June 30, Ms. Cullen sent Mr. Segarceanu a follow-up email confirming that SoFi had denied Mr. Segarceanu's application due to his status as a Conditional Permanent Resident, and stating: "As we discussed SoFi is following our current lending policies with regards to the citizenship documents.  I have attached your decline letter to this email."

99.     On or around July 21, 2020, Mr. Segarceanu opted out of SoFi's Dispute Resolution Agreement by following the proper procedure for opting out.

100.    As a result of SoFi's discriminatory policies, Mr. Segarceanu was denied the opportunity to contract with SoFi for personal loan financing, and he was unable to obtain a personal loan at SoFi's beneficial interest rate, notwithstanding his excellent creditworthiness.

101.    Mr. Segarceanu still has approximately $20,000 in credit card debt that he would like to refinance at a lower rate.  Due to SoFi's exclusionary policies, Mr. Segarceanu is not eligible to do so.

102.    Mr. Segarceanu has suffered harm as a result of SoFi's discriminatory policy and practice of making Conditional Permanent Residents ineligible for Loans on the same terms as U.S. citizens and LPRs.  Specifically, Sofi has denied Mr. Segarceanu the opportunity to contract for its advertised rates of 9-10%, boxing him into substantially higher interest rates of approximately 20%.  This is so despite the fact that Mr. Segarceanu's income and credit score would have otherwise allowed him to qualify for SoFi's advertised rates.

103.    Mr. Segarceanu also suffered an unnecessary invasion of privacy and reduction in his credit score when SoFi performed a "hard pull" of his credit report, in violation of the FCRA.

104.    Despite pulling Mr. Segarceanu's credit report, SoFi's policy meant that his actual creditworthiness and his ability to meet SoFi's underwriting criteria for the loan he sought were not relevant to its lending decision.

105.    SoFi's failure to prevent the consumer reports of Conditional Permanent Residents being

pulled guarantees that SoFi will obtain a significant number of consumer reports from Conditional Permanent Residents without having any need whatsoever to use the information in the report for credit eligibility purposes.

106.    Because SoFi requires permanent residents to provide a copy of their green cards, showing the issuance and expiration date, SoFi can easily identify Conditional Permanent Residents who are ineligible for Loans prior to pulling their credit during the application process.  Even without a copy of applicants' green cards, SoFi could easily use screening questions to filter out Conditional Permanent Residents prior to pulling their credit reports.  But SoFi does not utilize any such identification or filtering process.

107.    Under the FCRA, SoFi may not pull applicants' consumer reports without a permissible purpose.  It is not a permissible purpose for SoFi to obtain consumer reports for all permanent resident applicants even though it knows that many such applicants, like Mr. Segarceanu, are facially ineligible Conditional Permanent Residents.  In other words, SoFi's conduct guarantees that it will obtain consumer reports for Conditional Permanent Resident applicants even though it knows that it will not use the reports for credit eligibility purposes.

108.    Mr. Segarceanu suffered harm as a result of SoFi's discriminatory denial of his personal loan application and placement of a hard credit pull on his credit report.  SoFi also harmed Mr. Segarceanu by invading his privacy through conducting a hard credit pull.

### *SoFi's Policies Are Unlawful and Cause Continuing Harm*

109.    SoFi's requirement that DACA recipients apply by telephone only with U.S. citizen or LPR co-signers is not imposed on applicants who are U.S. citizens, LPRs, or certain visa-holders.  Applicants who are U.S. citizens, LPRs, or certain visa-holders may apply online, a process far more convenient and less time-intensive and burdensome than applying by telephone and are required to have co-signers only where an individualized assessment of their creditworthiness and credit risk suggests that one is necessary.

110.    SoFi's current policy towards DACA recipients ignores the actual creditworthiness of DACA recipients and whether their objective credit risk merits a co-signer requirement.  Instead, SoFi

requires that DACA recipients have co-signers based solely on their status as non-citizens with DACA, which is unlawful alienage and immigration status discrimination.

111.    SoFi's blanket policy of refusing to extend credit to Conditional Permanent Residents, regardless of their creditworthiness or actual credit risk, constitutes unlawful alienage and immigration status discrimination.  SoFi does not have a policy or practice of informing Conditional Permanent Residents that they may apply with a creditworthy U.S. citizen or LPR co-signer.  Rather, SoFi's policy is to reject loan applications from Conditional Permanent Residents outright, resulting in unlawful discrimination.

112.    Because SoFi (1) uniformly denies credit to Conditional Permanent Residents but (2) does not utilize any filtering mechanism to screen out Conditional Permanent Residents prior to pulling their credit reports but rather (3) pulls Conditional Permanent Residents' credit reports immediately or shortly after their applications are complete, SoFi has created a system that pulls consumer reports on a significant number of Conditional Permanent Residents for whom it never assesses creditworthiness. Accordingly, SoFi obtains consumer reports that it has no permissible purpose to pull.

113.    By obtaining Conditional Permanent Residents' consumer reports, SoFi has invaded their privacy and damaged their credit scores.

114.    SoFi causes these harms to occur by knowingly creating a series of policies, procedures, and processes that together cause it to obtain a significant number of consumer reports for Conditional Permanent Residents who are facially ineligible for SoFi's Loan and whose credit information SoFi will not use it connection with any transaction.

115.    SoFi's lack of permissible purpose under FCRA for obtaining Mr. Segarceanu's consumer report is a violation of the FCRA, 15 U.S.C. § 1681b(f).

116.    SoFi intentionally or recklessly obtained consumer reports it did not need in connection with any transaction to determine eligibility for credit.  SoFi's violations of the FCRA are thus willful.

117.    There is an actual and substantial controversy between Plaintiffs and SoFi.

## CLASS ACTION ALLEGATIONS

118.     Plaintiffs bring class allegations under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) on behalf of three nationwide classes.  First, Plaintiffs seek to certify a Section 1981 class pursuant to Fed. R. Civ. P. 23(b)(2) with respect to the claims of Section 1981 Class Members (as defined below).  Second, Plaintiffs seek to certify an Unruh Act class pursuant to Fed. R. Civ. P. 23(b)(3) with respect to the claims of Unruh Act Class Members.  Third, Plaintiff Segarceanu seeks to certify a FCRA class pursuant to Fed. R. Civ. P. 23(b)(2), and (b)(3) with respect to the claims of FCRA Class Members.

119.     Section 1981 Class Members are defined as all non-United States citizens who resided in the United States and had DACA or were Conditional Permanent Residents at the time they applied and were denied or unsuccessfully sought to apply for any SoFi Loan from May 19, 2017 through the date of final judgment in this action.

120.     Unruh Act Class Members are defined as all non-United States citizens who resided in the United States and had DACA or were Conditional Permanent Residents at the time they applied and were denied or unsuccessfully sought to apply for any SoFi Loan from May 19, 2018 through the date of final judgment in this action.

121.     FCRA Class Members are defined as all non-United States citizens who resided in the United States and were Conditional Permanent Residents at the time they applied and were denied or unsuccessfully sought to apply for any SoFi Loan, and whose consumer reports were obtained by SoFi from July 30, 2018 through the date of final judgment in this action.

122.     Section 1981 Class Members, Unruh Act Class Members and FCRA Class Members (collectively, "Class Members") are so numerous that joinder of all of them is impracticable.

123.     SoFi offers Loans nationwide, and USCIS has approved over 2.7 million initial and renewal requests for DACA.  Given DACA's age and education requirements, many DACA recipients have (a) recently attended, or are currently attending, an undergraduate or graduate university in the U.S.; (b) started businesses and other entrepreneurial ventures; and/or (c) sought mortgages and loans to improve their homes and help them build their and their family's lives.

124.     Likewise, there are an estimated 13.6 million LPRs currently residing in the United

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF SECTION 1981, CA STATE LAW AND FCRA
Case No. 4:20-cv-03386

States, an unknown number of whom are Conditional Permanent Residents.[25]  Many Conditional

Permanent Residents are recently married and, like DACA recipients, in need of loans to finance

continuing education, home ownership, and business ventures, or to refinance or consolidate student

loans and credit card debt for themselves and their families.

125.    Plaintiffs do not know the precise number of Class Members as this information is in

SoFi's possession.

126.    There are questions of law and fact common to Plaintiffs and Class Members, and these

questions predominate over any questions affecting only individual members.  Common questions

include, for each class, among others: (1) whether SoFi maintains, or previously maintained, policies

that bar Plaintiffs and Class Members from obtaining Loans because of their alienage or immigration

status; (2) whether SoFi currently maintains policies that bar Plaintiffs and Class Members with DACA

from obtaining Loans unless they have a creditworthy U.S. citizen or LPR co-signer and apply by

telephone because of their alienage or immigration status; (3) whether SoFi obtained the consumer

reports of Plaintiff Segarceanu and Class Members who are Conditional Permanent Residents under

circumstances where SoFi knew, or should have known, that such Class Members were facially

ineligible to obtain SoFi Loans; (4) whether SoFi had a permissible purpose to obtain consumer reports

in relation to applicants who were facially ineligible for the SoFi Loans for which they applied; (5)

whether SoFi's policies as set forth violate Section 1981, the Unruh Act and the FCRA; (6) whether the

alleged violations were willful; (7) whether Plaintiffs and the Class Members suffered harm by reason of

SoFi's unlawful policies; (8) whether Plaintiffs and Class Members are entitled to statutory damages; (9)

whether Plaintiffs and Class Members are entitled to punitive damages; (10) whether Plaintiffs and

Class Members are entitled to equitable and injunctive relief, and, if so, what equitable and injunctive

---

[25]    DHS, Office of Immigration Statistics, Estimates of the Lawful Permanent Resident Population in the United States and the Subpopulation Eligible to Naturalize: 2015-2019, *available at* https://www.dhs.gov/sites/default/files/publications/lpr_population_estimates_january_2015_-2019.pdf (last visited July 27, 2020); DHS, Immigrant Classes of Admission, *available at* https://www.dhs.gov/immigration-statistics/lawful-permanent-residents/ImmigrantCOA (last visited July 27, 2020) (counting conditional permanent residents based on marriage to U.S. citizen spouses among LPRs admission classes).

relief is warranted; and (11) the scope of a resulting permanent injunction.

127.    Mr. Juarez's claims under Section 1981 and the Unruh Act are typical of the claims of the Class Members: (1) Mr. Juarez has been within the jurisdiction of the United States and held DACA, federal work authorization, and a valid SSN at all relevant times; (2) Mr. Juarez applied or attempted to apply for a loan with SoFi; and (3) Mr. Juarez was denied an opportunity to contract with SoFi because of his alienage or immigration status under SoFi's policies that initially categorically barred DACA recipients and later restricted eligibility to DACA recipients with a creditworthy U.S. citizen or LPR co-signer.  Mr. Juarez's claims are substantially shared by other Class Members, as these claims arise from the same course of conduct by SoFi, and the relief sought is common.

128.    Mr. Segarceanu's claims under Section 1981, the Unruh Act and the FCRA are typical of the claims of the Class Members: (1) Mr. Segarceanu has been within the jurisdiction of the United States and has held a conditional green card and a valid SSN during the relevant period; (2) Mr. Segarceanu applied or attempted to apply for a loan with SoFi; (3) Mr. Segarceanu was denied an opportunity to contract with SoFi because of his alienage or immigration status under SoFi's policies that bar or otherwise restrict Conditional Permanent Residents from obtaining Loans regardless of their creditworthiness; and (4) In connection with his loan application, SoFi pulled Mr. Segarceanu's consumer report without having any legitimate business need for the credit report.  Mr. Segarceanu's claims are substantially shared by other Class Members, as these claims arise from the same course of conduct by SoFi, and the relief sought is common.

129.    Plaintiffs will also fairly and adequately represent and protect the interests of the Class Members.  Plaintiffs have no conflict with any Class Member and are committed to the goal of having SoFi rectify the harm that its policies have caused in the past and change its current business practices to stop discriminating against Plaintiffs and other Class Members.

130.    Plaintiffs have retained counsel competent and experienced in complex discrimination class actions.

131.    The universe of persons affected by SoFi's unlawful policies is ascertainable through SoFi's company records, including, for instance, its website records, logs, and data, as well as through

self-identification of Class Members through objective identifying factors, such as DACA status, a conditional green card, a valid SSN, and some evidence of having applied or sought to apply for Loans with SoFi.

### Certification Under Fed. R. Civ. P. 23(b)(2) and (b)(3)

132.     Class certification of Plaintiffs' and Class Members' Section 1981 claim is appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because SoFi has acted and/or refused to act on grounds generally applicable to all Class Members, making appropriate declaratory, equitable, and injunctive relief with respect to Plaintiffs and the Class Members as a whole.  SoFi has, in the past, excluded Class Members outright from obtaining Loans due to their alienage or immigration status.  SoFi currently excludes Class Members who are DACA recipients from obtaining Loans unless they apply with a creditworthy U.S. citizen or LPR co-signer, a requirement not imposed on U.S. citizen, LPR, and visa-holder applicants. SoFi also continues to exclude Class Members who are Conditional Permanent Residents from obtaining Loans.  Class Members are entitled to declaratory, equitable, and injunctive relief to end SoFi's common, unfair, and discriminatory policies.

133.     Class certification of Plaintiffs' and Class Members' claims under the Unruh Civil Rights Act is also appropriate pursuant to Fed. R. Civ. P. 23(b)(3) because common questions of fact and law predominate over any questions affecting only individual Class Members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation since joinder of all members is impracticable.  The Class Members have been damaged and are entitled to recovery of statutory penalties under the Unruh Act and other damages, not including actual damages, because of SoFi's common, unfair, and discriminatory policies.  Damages are capable of measurement on a classwide basis.  The propriety and amount of punitive damages are based on SoFi's conduct, making these issues common among Class Members.  Plaintiffs and the Class Members will rely on common evidence to resolve their legal and factual questions, including SoFi's applicable policies and practices during the relevant period.  There are no pending actions raising similar claims.  SoFi engages in continuous, permanent, and substantial activity in California.  There will be no undue difficulty in the management of this litigation as a class action.

134.    Class certification is also appropriate for the proposed FCRA Class pursuant to Fed. R. Civ. P. 23(b)(3) because common questions of fact and law predominate over any questions affecting only individual Class Members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation since joinder of all members is impracticable.  The Class Members have been damaged and are entitled to recovery because of SoFi's common, unfair, and unlawful practices.  Damages are capable of measurement on a classwide basis.  The FCRA provides for statutory damages per violation of $100 to $1,000.  The propriety and amount of statutory, punitive, and other damages are based on SoFi's conduct, making these issues common to Class Members.  Plaintiffs and the Class Members will rely on common evidence to resolve their legal and factual questions, including the applicable credit eligibility and underwriting policies, and SoFi's policies and practices regarding obtaining consumer reports of facially ineligible applicants.  There are no pending actions raising similar claims.  SoFi engages in continuous, permanent, and substantial activity in California. There will be no undue difficulty in the management of this litigation as a class action

**FIRST CLAIM FOR RELIEF**
**Alienage Discrimination**
**(42 U.S.C. § 1981)**

135.    Plaintiffs incorporates by reference the allegations in all preceding paragraphs.

136.    Plaintiffs bring this claim on behalf of themselves, and on behalf of all Class Members.

137.    Plaintiffs are persons within the jurisdiction of the United States.

138.    Mr. Juarez is a non-citizen with DACA, federal work authorization, and a valid SSN.

139.    Mr. Juarez has the right to make and enforce contracts in the United States and is entitled to the full and equal benefits of the law.

140.    Before early-December 2019, SoFi intentionally discriminated against Mr. Juarez and other Class Members with DACA due to their alienage status by making them ineligible to contract for Loans while making U.S. citizens and LPRs eligible to contract for Loans.

141.    After early-December 2019, SoFi continued intentionally discriminating against Mr. Juarez and other Class Members with DACA due to their alienage status by requiring them to meet conditions based solely on their alienage status to be eligible to contract for Loans.  Such conditions

include a requirement to apply by telephone only and a requirement to apply with a U.S. citizen or LPR co-signer.  These conditions are not imposed on U.S. citizen or LPR applicants.

142.    Mr. Segarceanu is a non-citizen and Conditional Permanent Resident who has a valid SSN and is authorized to work in the United States.

143.    At all relevant times, SoFi intentionally discriminated against Mr. Segarceanu and other Class Members who are Conditional Permanent Residents due to their alienage status by making them ineligible to contract for Loans while making U.S. citizens and other LPRs eligible to contract for Loans.

144.    SoFi's intentional discrimination against Plaintiffs and Class Members interfered with their right to make and enforce contracts for credit.

145.    SoFi's policies of making Plaintiffs and Class Members ineligible for Loans and forcing them to meet additional requirements to be eligible for Loans based solely on their alienage harmed them and constitute unlawful alienage discrimination in the making and enforcing of contracts in violation of 42 U.S.C. § 1981.

146.    Plaintiffs and Class Members have no plain, adequate, or complete remedy at law to redress the wrongs alleged herein, and the injunctive and equitable relief sought in this action is the only means of securing complete and adequate relief.  Plaintiffs and the Class Members they seek to represent are now suffering, and will continue to suffer, irreparable injury from SoFi's discriminatory acts and omissions.

### SECOND CLAIM FOR RELIEF
**Violation of the Unruh Civil Rights Act**
**(California Civil Code §§ 51 and 52 et seq.)**

147.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

148.    Plaintiffs bring this claim on behalf of themselves and on behalf of all Class Members.

149.    Plaintiffs are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments in California of every kind regardless of their immigration status and no business establishment of any kind in California whatsoever may refuse to contract with Plaintiffs because of their immigration or alienage status.

150.    SoFi is a business establishment under the Unruh Act, because it has a fixed location of business in California and it has an online place of business that sells products and services to consumers throughout California and nationwide.

151.    The Unruh Act applies to business transactions and services that are conducted via the internet, as well as internet-related conduct that is related to the activities of traditional brick-and-mortar establishments that have fixed, traditional presences.

152.    SoFi's lending policies, including the policies that deprived Plaintiffs and Class Members of the opportunity to contract for Loans on the same terms as U.S. citizens and LPRs, were developed in California and all of its decision-making as to Loan applicants occurs in California because its servers and headquarters are located there.  In addition, SoFi's Terms of Use are governed by California law. Accordingly, because the conduct that creates liability in this matter occurred in California, the Unruh Act – California law – should govern the conduct at issue.

153.    The discrimination alleged by Plaintiffs occurred in California because SoFi's place of business is in California, SoFi developed its lending policies and practices challenged by Plaintiffs in California, and it applies its challenged lending policies and practices to applications or attempted applications from Plaintiffs in California.

154.    Additionally, although Plaintiffs and Class Members are located throughout the United States, they bring this claim under the Unruh Act because SoFi's Terms of Use require California law to "govern[] in all respects . . . without regard to its provisions relating to conflict of laws."[26]

155.    Before early-December 2019, SoFi intentionally discriminated against Mr. Juarez and other Class Members with DACA due to their alienage or immigration status by making them ineligible to contract for Loans while making U.S. citizens and LPRs eligible to contract for Loans.  In doing so, SoFi denied them the full and equal services of its business.

156.    After early-December 2019, SoFi continued intentionally discriminating against Mr. Juarez and other Class Members with DACA due to their alienage or immigration status by requiring

---

[26]    SoFi, Terms of Service, *available at* https://www.sofi.com/terms-of-use/ (last visited July 27, 2020).

them to meet conditions based solely on their alienage status to be eligible to contract for Loans.  Such conditions include a requirement to apply by telephone only and a requirement to apply with a U.S. citizen or LPR co-signer.  These conditions are not imposed on U.S. citizen or LPR applicants.  In doing so, SoFi denied them the full and equal services of its business.

157.   Throughout the relevant time period, SoFi has also enforced a blanket policy and practice of refusing to make Loans available to Conditional Permanent Residents while making U.S. citizens and other LPRs eligible to contract for Loans.

158.   SoFi's policies of excluding DACA recipients and Conditional Permanent Residents from obtaining Loans and later permitting DACA recipients to apply for Loans only with a co-signer by telephone solely based on their alienage or immigration status harmed Plaintiffs and the Class Members and constitute unlawful discrimination in violation of Sections 51(b) and 51.5 of the Unruh Act.

159.   Pursuant to the Section 52(a) of the Unruh Act, Plaintiffs and Class Members are entitled to statutory damages of up to three times the amount of actual damages suffered per violation, but no less than $4,000, and attorneys' fees.  Pursuant to Section 52(c) of the Unruh Act, Plaintiffs and Class Members are also entitled to injunctive and other equitable relief against such unlawful practices in order to prevent future damages, for which there is no adequate remedy at law, and to avoid a multiplicity of lawsuits.

## THIRD CLAIM FOR RELIEF
### Obtaining Consumer Reports Without a Permissible Purpose
### (FCRA, 15 U.S.C. § 1681b(f))

160.   Mr. Segarceanu incorporates by reference the allegations in all preceding paragraphs.

161.   Mr. Segarceanu brings this claim on his own behalf and on behalf of all FCRA Class Members.

162.   SoFi obtained consumer reports from Mr. Segarceanu and FCRA Class Members with no intention of using them.

163.   SoFi considers Conditional Permanent Residents to be ineligible for Loans.

164.   SoFi collected applications from all permanent residents, including Conditional Permanent Residents and those with unconditional permanent residency.

165.    SoFi obtained consumer reports from all permanent residents, including Conditional Permanent Residents, immediately upon application.

166.    SoFi did not have a legitimate need to assess the creditworthiness of Conditional Permanent Residents because it considered them categorically ineligible for Loans.

167.    Therefore, SoFi's pulling of Conditional Permanent Residents' credit reports had no connection to Conditional Permanent Residents' underlying Loan applications.

168.    SoFi willfully or recklessly violated the FCRA by having neither a permissible purpose nor a legitimate business need for its use of Mr. Segarceanu's consumer report.  SoFi should have known that when it created a process that collects a large number of consumer reports, while it only has a reason to review and use some of them in the underwriting process, the ones it does not use are not obtained "in connection with" a credit transaction and therefore it lacks a permissible purpose for obtaining them.

169.    By obtaining Mr. Segarceanu's consumer report without a permissible purpose, SoFi has invaded his privacy and harmed his credit score.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs and Class Members pray for relief as follows:

170.    Certification of a class pursuant to Fed. R. Civ. P. 23(b)(2) with respect to Plaintiffs' and Section 1981 Class Members' claims under Section 1981;

171.    Certification of a class pursuant to Fed. R. Civ. P. 23(b)(3) with respect to Plaintiffs' and Unruh Act Class Members' claims under the Unruh Act;

172.    Certification of a class pursuant to Fed. R. Civ. P. 23(b)(3) with respect to Mr. Segarceanu's and FCRA Class Members' claims under the FCRA;

173.    Designation of Mr. Juarez as a representative on behalf of the Section 1981 Class and Unruh Act Class;

174.    Designation of Mr. Segarceanu as a representative on behalf of the Section 1981 Class, Unruh Act Class and FCRA Class;

175.    Designation of Plaintiffs' counsel of record as Class Counsel;

176.    A declaratory judgment that the practices complained of herein are unlawful and violate Section 1981, Sections 51(b) and 51.5 of the Unruh Act and the FCRA;

177.    A preliminary and permanent injunction against SoFi and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful policies, practices, customs and usages set forth herein;

178.    All damages sustained as a result of SoFi's conduct, according to proof;

179.    Statutory damages to the extent allowable by law;

180.    Exemplary and punitive damages in an amount commensurate with SoFi's ability to pay and to deter future conduct;

181.    Injunctive remedies, including restitution;

182.    Costs incurred herein, including reasonable attorneys' fees to the extent allowable by law;

183.    Pre-judgment and post-judgment interest, as provided by law; and

184.    Such other and further legal and equitable relief as this Court deems necessary, just, and proper.


Dated: New York, New York                        Respectfully submitted,
                June 30, 2020

                                        By:    /s/ Ossai Miazad
                                               OUTTEN & GOLDEN LLP

                                               Ossai Miazad*
                                               Michael N. Litrownik*
                                               OUTTEN & GOLDEN LLP
                                               685 Third Avenue, 25th Floor
                                               New York, NY 10017
                                               Telephone: (212) 245-1000
                                               Facsimile:  (646) 509-2060
                                               om@outtengolden.com
                                               mlitrownik@outtengolden.com

                                               Moira Heiges-Goepfert (Cal. Bar No. 326861)
                                               OUTTEN & GOLDEN LLP
                                               One California Street, 12th Floor
                                               San Francisco, California 94111

FIRST AMENDED COMPLAINT FOR VIOLATIONS
OF SECTION 1981, CA STATE LAW AND FCRA
Case No. 4:20-cv-03386

Telephone: (415) 638-8800
Facsimile:  (415) 638-8810
mhg@outtengolden.com

Mikael A. Rojas (Cal. Bar No. 309626)
OUTTEN & GOLDEN LLP
601 Mass. Avenue NW, Suite 200W
Washington, D.C. 20001
Telephone: (202) 847-4400
Facsimile:  (646) 509-2008
mrojas@outtengolden.com

Ivan Espinoza-Madrigal**
Oren Nimni**
LAWYERS FOR CIVIL RIGHTS
61 Batterymarch Street, 5th Floor
Boston, MA 02110
Telephone: (617) 482-1145
Facsimile:  (617) 482-4392
iespinoza@lawyersforcivilrights.org
onimni@lawyersforcivilrights.org

*Admitted *Pro hac vice*
***Pro hac vice* application forthcoming
***Attorneys for Plaintiffs and the proposed Class***