UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUBEN JUAREZ, et al.,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>SOCIAL FINANCE, INC., et al.,<br><br>　　　　Defendants. | Case No. 20-cv-03386-HSG<br><br>**ORDER DENYING MOTION TO COMPEL ARBITRATION AND GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**<br><br>Re: Dkt. No. 38 |

Pending before the Court is the motion to compel arbitration and motion to dismiss filed by the Defendants Social Finance Inc. and Social Finance Lending Corp (collectively, "SoFi"). Dkt. No. 38. The Court held a hearing on December 3, 2020. For the reasons detailed below, the Court **DENIES** the motion to compel and **GRANTS IN PART** and **DENIES IN PART** the motion to dismiss.

I.  **BACKGROUND**

Plaintiffs Ruben Juarez and Calin Constantin Segarceanu filed this putative class action against SoFi on May 19, 2020. *See* Dkt. No. 1. In July 2020, Plaintiffs filed an amended complaint. *See* Dkt. No. 33 ("FAC"). In the amended complaint, Plaintiffs allege that SoFi denied their attempts to apply for loans due to Mr. Juarez's status as a Deferred Action for Childhood Arrivals ("DACA") recipient[1] and Mr. Segarceanu's status as a conditional permanent resident ("CPR"). Plaintiffs allege that such policies and practices constitute unlawful discrimination. *See* FAC at ¶¶ 7, 111, 115.

//

---

[1] DACA is a form of deferred action against removal, a discretionary grant of authorized stay by the federal government. *See* FAC at ¶¶ 28–35.

### A. Plaintiff Juarez

Mr. Juarez became a DACA recipient on October 25, 2012. FAC at ¶ 59. To finance his education in the United States, Mr. Juarez obtained private student loans. *See id.* at ¶¶ 63–64. Plaintiffs allege that in 2016, Mr. Juarez received promotional material from SoFi offering student loan refinancing services. *Id.* at ¶ 65. In approximately November 2016, Plaintiff first visited SoFi's website to begin the application process to refinance his student loans. *Id.* at ¶¶ 66–68. After entering basic information such as his name and email, the website prompted Mr. Juarez to indicate whether he was a U.S. citizen, lawful permanent resident ("LPR"), or visa-holder. *Id.* at ¶ 68. Plaintiffs allege that because Mr. Juarez is a DACA recipient—and not a U.S. citizen, LPR, or visa-holder—SoFi's online application process did not allow him to complete and submit his online application. *Id.* at ¶ 68.

Plaintiffs further allege that Mr. Juarez made subsequent attempts to apply for student loan refinancing on June 13, 2017 and December 8, 2018, and in late July 2019. *Id.* at ¶¶ 70–72, 74. Plaintiffs explain that in 2017 and 2018, Mr. Juarez called SoFi's customer service number to ask whether SoFi had changed its eligibility policy for DACA recipients. *Id.* at ¶¶ 71–72. Plaintiffs allege that in both instances, a SoFi customer service representative informed Mr. Juarez that the policy had not changed. *Id.* In 2019, Mr. Juarez attempted to submit another application through SoFi's website, but as in 2016, he was unable to complete or submit the online application because he was not a U.S. citizen, LPR, or visa-holder. *Id.* at ¶ 74. Plaintiffs allege that SoFi only changed its policies in December 2019, allowing DACA recipients to apply for lending services if they had "a creditworthy U.S. citizen or LPR co-signer." *Id.* at ¶ 77.

### B. Plaintiff Segarceanu

In October 2018, Mr. Segarceanu, a Romanian national, married his wife, a U.S. citizen, and thereafter applied for permanent residency. FAC at ¶¶ 80, 84. On September 11, 2019, he obtained a conditional green card with a two-year validity period. *Id.* at ¶ 84. On June 19, 2020, Mr. Segarceanu completed SoFi's online application for a personal loan. *See id.* at ¶¶ 86–88. As part of this process, he was asked to upload a copy of his green card. *See id.* at ¶ 89. That same day, SoFi conducted a "hard pull" of his credit report. *See id.* at ¶¶ 90–91. Plaintiffs allege that at

the time, SoFi had a policy that permanent residents were ineligible for loans if their green cards had a validity period of two years or less. *See id.* at ¶ 6. On June 20, SoFi emailed Mr. Segarceanu requesting that he provide a copy of his Form I-751 as proof that he had applied for, or had been granted an extension of, his green card. *Id.* at ¶ 92. But Mr. Segarceanu could not provide the form because his green card was not yet eligible for renewal. *Id.* at ¶ 93. On June 30, SoFi notified Mr. Segarceanu that his application had been denied due to his status as a CPR. *Id.* at ¶¶ 94–95.

*   *   *

Based on these facts, Plaintiffs assert causes of action for (1) alienage discrimination, in violation of 42 U.S.C. § 1981; (2) discrimination, in violation of the California Unruh Civil Rights Act §§ 51, *et seq.*; and (3) obtaining consumer reports without a permissible purpose, in violation of the Fair Credit and Reporting Act, 15 U.S.C. §§ 1681, *et seq.* ("FCRA"). *Id.* at ¶¶ 135–69. Plaintiffs also indicate that they will seek to certify three classes: (1) a Section 1981 class[2] pursuant to Fed. R. Civ. P 23(b)(2); (2) an Unruh Act class[3] pursuant to Fed. R. Civ. P. 23(b)(3); and (3) a FCRA class[4] pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3). *Id.* at ¶ 118.

SoFi now moves to compel arbitration as to Mr. Juarez's claims, and to dismiss all Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6). *See* Dkt. No. 38.

## II. LEGAL STANDARD

### A. Motion to Compel Arbitration

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.*, sets forth a policy favoring arbitration agreements and establishes that a written arbitration agreement is "valid, irrevocable,

---

[2] The Section 1981 Class is defined as "all non-United States citizens who resided in the United Sates and had DACA or were CPRs at the time they applied and were denied or unsuccessfully sought to apply for any SoFi Loan from May 19, 2017 through the date of the final judgement in this action." FAC at ¶ 119.
[3] The Unruh Act Class is defined as "all non-United States citizens who resided in the United States and had DACA or were CPRs at the time they applied and were denied or unsuccessfully sought to apply for any SoFi Loan from May 19, 2018 through the date of final judgement in this action." *Id.* at ¶ 120.
[4] The FCRA Class is defined as "all non-United States citizens who resided in the United States and were CPRs at the time they applied and were denied or unsuccessfully sought to apply for any SoFi Loan, and whose consumer reports were obtained by SoFi form July 30, 2018 through the date of final judgement in this action." *Id.* at ¶ 121.

and enforceable." 9 U.S.C. § 2; *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (noting federal policy favoring arbitration); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) (same). The FAA allows that a party "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that . . . arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. This federal policy is "simply to ensure the enforceability, according to their terms, of private agreements to arbitrate." *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ.*, 489 U.S. 468, 476 (1989). Courts must resolve any "ambiguities as to the scope of the arbitration clause itself . . . in favor of arbitration." *Id.*

When a party moves to compel arbitration, the court must determine (1) "whether a valid arbitration agreement exists" and (2) "whether the agreement encompasses the dispute at issue." *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004). The agreement may also delegate gateway issues to an arbitrator, in which case the court's role is limited to determining whether there is clear and unmistakable evidence that the parties agreed to arbitrate arbitrability. *See Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). In either instance, "before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) (citing 9 U.S.C. § 2).

### B.  Motion to Dismiss

Under Federal Rule of Civil Procedure 12(b)(6), the Court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court accepts as true a plaintiff's well-pleaded factual allegations and construes all factual inferences in the light most favorable to the plaintiff. *Id.* However, a plaintiff must provide "more than labels and conclusions." *Twombly*, 550 U.S. at 555. The Court does not credit allegations that are

4

1  conclusory, unwarranted deductions of fact, or unreasonable inferences.  *Kwan v. SanMedica Int'l*,
2  854 F.3d 1088, 1096 (9th Cir. 2017).
3  **III.     DISCUSSION**
4      **A.     Motion to Compel Arbitration[5]**
5      In support of its motion to compel, SoFi contends its records indicate that Mr. Juarez
6  expressly consented to arbitration in 2016 when he first registered as a new user on SoFi's
7  website.  *See* Dkt. No. 38 at 7; *see also* Dkt. No. 38-1 ("Donohoe Decl.") at ¶ 7, & Exs. C–D.
8  SoFi explains that to register as a new user, Mr. Juarez had to acknowledge and agree to be bound
9  by several agreements, including an arbitration agreement.  *See id.* at ¶¶ 5–6, & Ex. A–B.  This is
10 reflected on the sign-in page as reproduced below:



23 *See id.* at Ex. A.  SoFi explains that without affirmatively checking the box manifesting his
24 consent, Mr. Juarez could not have signed in or proceeded with any loan application on the
25 website.  *See id.* at ¶ 6.  SoFi therefore argues that Mr. Juarez must have affirmatively checked the

---

[5] SoFi's motion to compel only applies to Mr. Juarez, as Plaintiffs allege—and SoFi appears to concede—that Mr. Segarceanu opted out of SoFi's alternative dispute resolution agreement.  *See* FAC at ¶ 99.

box stating, "I agree." *See* Dkt. No. 38 at 10; *see also* Donohoe Decl., Ex. A.

The arbitration agreement itself states:

> [A]ny claim, dispute or controversy arising out of or related to (i) my registration on SoFi's website, (ii) my submission of information to SoFi in connection with any non-mortgage loan offered by SoFi, (iii) my application for any non-mortgage loan offered by SoFi, (iv) my participation in SoFi's career services or entrepreneur program, or (v) the disclosures provided to me by SoFi in connection with any non-mortgage loan that SoFi offers (collectively, "Claim") shall be, at my or your election, submitted to and resolved on an individual basis by binding arbitration under the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. (the "FAA") before the American Arbitration Association ("AAA") under its Consumer Arbitration Rules ("AAA Rules") in effect at the time the arbitration is brought . . . .

*See* Donohue Decl., Ex. B.

SoFi contends that all Mr. Juarez's claims "plainly fall within the Arbitration Agreement," even those that relate to his 2017, 2018, and 2019 applications. *See* Dkt. No. 38 at 12. Plaintiffs do not appear to contest SoFi's representation about the design and content of the website or the language of the arbitration agreement. Instead, Plaintiffs respond that (1) the arbitration agreement lacked adequate consideration because Mr. Juarez was ineligible for a loan under SoFi's polices from the outset; and (2) even if there were a valid agreement, it only applies to Mr. Juarez's 2016 application, not his subsequent efforts to refinance his student loans. *See* Dkt. No. 41 at 5–9.

### i. Consideration

Plaintiffs first argue that the arbitration agreement Defendant says was entered in 2016 "lacks consideration to be binding." *See* Dkt. No. 41 at 5. Plaintiffs explain that because there was no possibility that Mr. Juarez could have contracted with SoFi for any of its services—due to his DACA status—any consideration was illusory. *See id.* The Court is not persuaded.

Plaintiffs' own authorities recognize that a "promise to be bound by the arbitration process itself serves as adequate consideration." *See id.* (citing *Circuit City Stores, Inc. v. Najd*, 294 F.3d 1104, 1108 (9th Cir. 2002)). Courts have repeatedly found under California law that "[w]here an agreement to arbitrate exists, the parties' mutual promises to forego a judicial determination and to arbitrate their disputes provide consideration for each other" as "[b]oth parties gave up the same

6

rights and thus neither gains an advantage over the other." *Strotz v. Dean Witter Reynolds*, 223 Cal. App. 3d 208, 216 (Cal Ct. App. 1990), *overruled on other grounds by Rosenthal v. Great Western Fin. Secs. Corp.*, 14 Cal. 4th 394 (Cal. 1996).[6] The Ninth Circuit has made clear that the inquiry into the adequacy of consideration is very limited, noting that "the first lesson in contracts [is] the peppercorn theory—that courts will not inquire into the adequacy of consideration, so long as it was true and valuable." *See Pope v. Sav. Bank of Puget Sound,* 850 F.2d 1345, 1356 (9th Cir. 1988).

In the face of this well-established and binding case law, Plaintiffs rely on a single Texas state law case they claim carves out an exception to the general rule. *See* Dkt. No. 41 at 6 (citing *In re Rio Grande Reg'l Hosp.*, No. 13 Civ. 352, 2009 WL 481886, at *3, *7–8 (Tex. App. Feb. 25, 2009)). In *In re Rio Grande*, the court applied Texas law in holding that a temporary hospital employee who was injured on the job was not compelled to arbitrate her claim based on an arbitration provision contained in the hospital's employee health plan. *Id*. at *7. Although the plaintiff signed plan documents in which she elected to receive benefits, as a temporary employee she was ineligible. *See id.* The court reasoned that because under the terms of the health plan the plaintiff only "agreed to arbitrate her disputes in exchange for being allowed to participate in the benefit plan established by Rio Grande," the agreement lacked consideration. *Id*. Even if the Court found this reasoning persuasive and applicable to the question of California law presented here, there is no evidence before the Court that Plaintiff only agreed to arbitrate in exchange for consideration or approval of his refinance application. The Court finds that the parties' mutual agreement to arbitrate is thus sufficient consideration.

### ii.     Scope

Next, Plaintiffs contend that even if the 2016 arbitration agreement is valid, it is limited in scope and does not apply to Mr. Juarez's applications in 2017, 2018, and 2019. *See* Dkt. No. 41 at 7. In their opposition brief, Plaintiffs explain that Mr. Juarez's claims are not premised on the 2016 application at all. *See* Dkt. No. 41 at 1, 8, & n.6. Plaintiffs even acknowledge that such

---

[6] Although the arbitration agreement does not appear to contain a choice-of-law provision, during the hearing the parties confirmed that California law should apply.

claims likely would fall outside the statute of limitations under both § 1981 and the Unruh Civil Rights Act. *Id.* at 8, n.6. However, SoFi does not present any additional arbitration agreements related to the subsequent applications. Nor does it suggest that when consumers attempt to submit applications or make inquiries over the telephone they are required to agree to any specific terms. SoFi's motion, therefore, asks the Court to find that the 2016 arbitration agreement extends beyond that single student loan refinance application.

*First*, the Court considers the plain language of the 2016 arbitration agreement. When deciding whether parties agreed to arbitrate a certain matter, "courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Under California law, "the mutual intention of the parties at the time the contract is formed governs interpretation." *AIU Ins. Co., v. Super Ct*., 51 Cal. 3d 807, 821 (Cal. 1990) (citing Cal. Civ. Code § 1636). "Such intent is to be inferred, if possible, solely from the written provisions of the contract." *Id.* (citing Cal. Civ. Code § 1639). The Court interprets terms "in their 'ordinary and popular sense.'" *Id.* Ambiguous language is construed against the drafter. *Id*. (citing Cal. Civ. Code § 1654).

Here, the arbitration agreement is limited in scope. Although it states that it applies to "any claim, dispute, or controversy arising out of or related to" Mr. Juarez's registration on SoFi's website; submission of information to SoFi in connection with a non-mortgage loan; or application for any non-mortgage loan, it is framed to reference a single "registration," "submission" or "application" to SoFi. *See* Donohue Decl., Ex. B. Despite SoFi's urging, the arbitration agreement does not state that it applies to *all* registrations, submissions, or applications ever made to SoFi. Rather, it applies on a transaction-by-transaction basis. SoFi's suggestion that this arbitration agreement nevertheless extends in perpetuity to all future registrations, submissions, or applications is simply not supported by the plain language of the agreement.

SoFi also points to a "survival" clause in the arbitration agreement. *See* Donohue Decl., Ex. B. The clause states:

> This Dispute Resolution Agreement shall survive the conclusion of any SoFi consumer product or service, full payment of any loan, your sale or transfer of any loan, any bankruptcy or insolvency, any

8

> forbearance or modification granted pursuant to this Agreement, any cancellation or request for cancellation of the Agreement or any disbursements under the Agreement.

*See id.* Based on this language, SoFi argues that the agreement survives the "conclusion of any SoFi consumer product or service," and therefore extends beyond the 2016 application. Dkt. No. 38 at 12. But Mr. Juarez was never approved for any SoFi product or service. And in any event, that the arbitration agreement may "survive" after the conclusion of such a product or service only alters its duration, not its scope.

*Second*, SoFi suggests that Mr. Juarez's interactions with SoFi in 2017, 2018, and 2019 were merely a continuation of his 2016 student loan refinance application. Dkt. No. 43 at 5. SoFi thus argues that the 2016 arbitration agreement should still govern claims arising from these communications. However, the allegations in the amended complaint do not support this contention. As alleged, Mr. Juarez attempted to apply for student loan refinancing in 2016, but he was not able to complete and submit the application. *See* FAC at ¶ 68. Mr. Juarez asserts that he was thus "denied the ability to contract for student loan refinancing with SoFi." *Id.* Plaintiffs explain that Mr. Juarez later received additional student loan refinancing offers from SoFi in 2017, 2018, and 2019. *Id.* at ¶ 69. Based on these offers, he unsuccessfully attempted to apply for refinancing by calling SoFi's customer service number in 2017 and 2018, and submitting a new application online in 2019. *See id.* at ¶¶ 70–75. Critically, Mr. Juarez does not contend that he was seeking to reopen, or asking SoFi to reconsider, his 2016 application. Rather, the complaint asserts that these were standalone attempted transactions with SoFi. The Court therefore concludes that Mr. Juarez's inquiries to SoFi in 2017, 2018, and 2019 do not fall within the scope of the 2016 arbitration agreement, and accordingly **DENIES** SoFi's motion to compel arbitration.

\*   \*   \*

SoFi argues, in the alternative, that the Court should nonetheless strike the class allegations because Plaintiffs do not limit the putative classes to those who sought to obtain only student loan refinancing or personal loans, as Mr. Juarez and Mr. Segarceanu did. *See* Dkt. No. 38 at 23–25. Rather, the proposed classes include individuals who sought to apply for any SoFi loan, including "student loans, personal loans, and home mortgage and improvement loans, refinances of student

loans, and offers [for] credit card consolidation." *See* FAC at ¶¶ 2, 119–121. As this Court has previously explained, a growing number of courts generally disfavor motions to strike, finding that they "serve little useful purpose in modern federal practice, and are often wielded mainly to cause delay and inflict needless burdens on opposing parties." *See Stiner v. Brookdale Senior Living, Inc.*, 354 F. Supp. 3d 1046, 1063, n.7 (N.D. Cal. 2019) (quoting *Inn S.F. Enter., Inc. v. Ninth St. Lodging, LLC*, No. 3:16-CV-00599-JD, 2016 WL 8469189, at *1 (N.D. Cal. Dec. 19, 2016)). And although district courts have authority to strike class allegations at the motion to dismiss stage, courts generally refrain from doing so because such motions are usually premature before the issue of class certification is before the court. *See, e.g.*, *Smith v. Keurig Green Mountain, Inc.*, 393 F. Supp. 3d 837, 849 (N.D. Cal. 2019); *Astiana v. Ben & Jerry's Homemade, Inc.*, 2011 WL 2111796, at *14–15 (N.D. Cal. May 26, 2011); *Rosales v. FitFlop USA, LLC*, 882 F. Supp. 2d 1168, 1179 (S.D. Cal. 2012).

In keeping with the general practice of disfavoring motions to strike in this context, the Court declines to strike the class allegations here. Plaintiffs allege that SoFi discriminates against DACA recipients and CPRs, regardless of the type of loan the applicants sought. *See, e.g.*, FAC at ¶¶ 140–141. At least as alleged, therefore, the conduct and injury to class members are the same regardless of the specific type of loan sought. SoFi has not shown that the Court should strike the class allegations at this early stage. To the extent the case proceeds, SoFi may address these issues at the class certification stage.

### B. Motion to Dismiss

#### i. 42 U.S.C. § 1981

SoFi argues that Plaintiffs' § 1981 claim must be dismissed because SoFi's policies do not constitute alienage discrimination. SoFi asserts that its conduct is permissible under the Equal Credit Opportunity Act (the "ECOA"), 15 U.S.C. §§ 1691, *et seq.* Dkt. No. 38 at 16. The Court thus considers the meaning of § 1981 and the scope of the ECOA.

##### a. Alienage Discrimination

Section 1981(a) provides, in relevant part, that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce

contracts . . . and to the full and equal benefit of laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a). The Supreme Court has explained that the protections under the statute "extend to aliens as well as to citizens." *See Graham v. Richardson*, 403 U.S. 365, 377 (1971); *see also Sagana v. Tenorio*, 384 F.3d 731, 738 (9th Cir. 2004), *as amended* (Oct. 18, 2004) (holding "[j]ust as the word 'white' indicates that § 1981 bars discrimination on the basis of race, the word 'citizen' attests that a person cannot face disadvantage in the activities protected by § 1981 solely because of his or her alien status").

Here, SoFi contends that it does not discriminate on the basis of citizenship status at all, but rather takes immigration status into account. SoFi thus suggests that discrimination based on immigration status and discrimination based on citizenship, or alienage, are two distinct types of discrimination that are treated differently under § 1981. Dkt. No. 38 at 13. On a practical level, SoFi asserts that it does not discriminate against non-citizens because *some* non-citizens—namely LPRs and some visa-holders—are still eligible to contract for credit with SoFi. *Id.* at 16. This distinction, however, is not supported by the language of the statute.

As the Ninth Circuit has explained, "the plain language of a statute should be enforced according to its terms, [and] in light of its context." *ASARCO, LLC v. Celanese Chem. Co.*, 792 F.3d 1203, 1210 (9th Cir. 2015). Under the plain language of the statute, the protections of § 1981 extend to "*all persons* within the jurisdiction of the United States." 42 U.S.C. § 1981 (emphasis added). The Supreme Court has interpreted "all persons" to include all lawfully present immigrants. *See Torao Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 (1948). And DACA recipients and CPRs are considered lawfully present immigrants. *See, e.g.*, *Peña v. Wells Fargo Bank, N.A.*, No. 1-cv-04065-MMC, 2019 WL 7050148 at *2 (N.D. Cal. Dec. 23, 2019) (*citing Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1059 (9th Cir. 2014)). That SoFi (allegedly) discriminates against only a subset of lawfully present immigrants does not somehow insulate its policies from scrutiny under § 1981.

Moreover, § 1981's legislative history underscores that it was intended to apply broadly. The operative language of § 1981 originated in § 1 of the Civil Rights Act of 1866, which was designed to prohibit racial discrimination in the creation and enforcement of contracts by

11

protecting "citizens of every race and color." *See Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 384–88 (1982) (detailing legislative history); *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 285–96 (1976) (same). In 1870, Congress replaced the phrase "citizens of every race and color" with the current language, "all persons within the jurisdiction of the United States." *See Sagana*, 384 F.3d at 737–38, & n.3. As the Ninth Circuit has noted, "Congress chose with care the word 'persons'" to "extend[] the safeguards of the civil rights statutes to aliens." *Id.* at 738. Neither § 1981's plain language nor its legislative history supports SoFi's suggestion that the statute contains a carveout for specific categories of immigrants. *See BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) ("[We] presume that [the] legislature says in a statute what it means and means in a statute what it says there.").

Because both Messrs. Juarez and Segarceanu are immigrants lawfully present in the United States, FAC at ¶¶ 119–121, Plaintiffs have adequately alleged that SoFi's policies discriminated against them in violation of § 1981.

### b. ECOA

SoFi next suggests that its policies are consistent with, and permissible under, the ECOA. Dkt. No. 43 at 8. The ECOA provides, in relevant part, that it is "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of credit transaction . . . on the basis of race, color, religion, national origin, sex or marital status, or age . . . ." *See* 15 U.S.C. § 1691(a)(1). It was initially enacted "to eradicate credit discrimination waged against women, especially married women whom creditors traditionally refused to consider for individual credit." *Bros. v. First Leasing*, 724 F.2d 789, 793–94 (9th Cir. 1984) (quotations omitted). The statute was later expanded to include the other categories listed above as "one more tool to be used in our vigorous national effort to eradicate invidious discrimination 'root and branch' from our society." *Id.* at 794 (quotations omitted).

On its face, the ECOA does not address discrimination on the basis of alienage or immigration status. And there is no apparent conflict between that statute and § 1981. As the court in *Perez v. Wells Fargo* reasoned, the ECOA and § 1981 "can be read to give effect to both, in that § 1981 precludes a creditor from discriminating on the basis of race or alienage, whereas

12

the ECOA precludes a creditor from discriminating on additional grounds, such as religion and national origin." *Perez v. Wells Fargo & Co.*, 2017 WL 3314797 at *3–4 (N.D. Cal. August 3, 2017). In *Perez*, the plaintiffs were a group of DACA recipients who applied for credit from Wells Fargo and were denied because they were neither U.S. citizens nor permanent residents, as required by the bank's lending policies. *See id.* at *1. The plaintiffs asserted claims for alienage discrimination under § 1981. *Id.* As in this case, the bank argued that the § 1981 claims should be dismissed based on the ECOA. But the *Perez* court rejected this argument, reasoning that the ECOA was enacted to expand protections against credit discrimination. *See id.* at *2–4. The Court finds the reasoning in *Perez* persuasive, and adopts it here. Accordingly, the Court finds that the ECOA was not intended to limit any of the broad protections afforded by § 1981.

SoFi points to a regulation promulgated under the ECOA to suggest that "information as to immigration status and permanence of residency are [nevertheless] appropriate risk factors to consider in making lending decisions . . . ." *See* Dkt. No. 38 at 16. The Bureau of Consumer Financial Protection issued Regulation B "to promote the availability of credit to all creditworthy applicants without regard to race, color, religion, national origin, sex, marital status, or age." *See* 12 C.F.R. § 1002.1. Regulation B states that a "creditor may inquire about the permanent residency and immigration status of an applicant or any other person in connection with a credit transaction." *See* 12 C.F.R. § 202.5(e). The Court has some concerns that this regulation could be read to conflict with § 1981. The parties do not address this issue directly, and the Court has not identified any case in which this issue was specifically discussed. In any event, at this early stage in the litigation, the Court need not resolve this potential issue. Even assuming Regulation B is consistent with § 1981, it does not empower a creditor to decline credit *solely* on the basis of immigration status. *See Perez*, 2017 WL 3314797, at *2, n.4. And as alleged here, SoFi did not allow certain non-citizens to apply for credit, and they were ineligible solely on the basis of their status. *See generally* FAC. The Court therefore denies SoFi's motion to dismiss on this basis.

### ii. Unruh Civil Rights Act

SoFi next moves to dismiss Plaintiffs' claim for discrimination under California's Unruh Civil Rights Act, Cal. Civ. Code §§ 51 *et seq.* Dkt. No. 38 at 17. SoFi contends that because

13

1   Plaintiffs are not residents of California and the conduct alleged in the complaint did not occur in

2   California, the Unruh Civil Rights Act is inapplicable. *Id.*

3       The Act states:

> All persons *within the jurisdiction of this state* are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

9   Cal. Civ. Code § 51(b) (emphasis added). It therefore expressly applies only to discrimination that

10  occurs in California. *See, e.g.*, *Moore v. Greyhound Bus Lines, Inc.*, No. 15-CV-1186-CAB

11  (MDD), 2018 WL 3361395, at *2 (S.D. Cal. July 10, 2018) (collecting cases). The California

12  Supreme Court has also cautioned against the extraterritorial application of California's laws. *See*

13  *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1207 (Cal. 2011) ("However far the Legislature's

14  power may theoretically extend, we presume the Legislature did not intend a statute to be

15  operative, with respect to occurrences outside the state, . . . unless such intention is clearly

16  expressed or reasonably to be inferred from the language of the act or from its purpose, subject

17  matter or history.") (quotations omitted).

18      Plaintiffs do not appear to dispute any of this. *See* Dkt. No. 41 at 13–14. Rather, they

19  suggest that "the alleged discriminatory conduct clearly occurred in California" because "SoFi

20  developed and implemented" the challenged policies "at its headquarters in California." *See id.* at

21  14. In support of this contention, Plaintiffs point to a conclusory statement in their complaint that

22  "SoFi's lending policies, including the policies that deprived Plaintiffs and Class Members of the

23  opportunity to contract for Loans on the same terms as U.S. citizens and LPRs, were developed in

24  California and all of its decision-making as to Loan applicants occurs in California because its

25  servers and headquarters are located there." *See* FAC at ¶ 152. Yet Plaintiffs offer no factual

26  support for this contention, and the Court need not accept their conclusory allegations as true. *See*

27  *Kwan*, 854 F.3d at 1096. Plaintiffs have failed to allege facts sufficient to plausibly suggest that

28  the discriminatory conduct at issue in this case occurred in California, as would be necessary to

14

apply the Act to claims by individuals who, without dispute, are not California residents. The Court therefore grants SoFi's motion on this basis.

### iii. FCRA

SoFi also moves to dismiss Plaintiffs' FCRA claim. *See* Dkt. No. 38 at 20–22. The FCRA ensures fair and accurate credit reporting, promotes efficiency in the banking system and protects consumer privacy. *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 52 (2007). To further these goals, the FCRA prohibits third parties from accessing consumer credit reports without a statutorily-authorized purpose. *See* 15 U.S.C. §§ 1681(b) *et seq*. Plaintiffs allege that SoFi obtained Mr. Segarceanu's consumer report without a permissible purpose under the FCRA because SoFi knew or should have known that he was ineligible under SoFi's lending policies before it performed a "hard pull" of his credit. *See* FAC at ¶¶ 90, 91. In response, SoFi contends that it did have a permissible purpose to pull Mr. Segarceanu's credit because he had applied for refinancing. Dkt. No. 38 at 20–21. SoFi therefore urges that it "intend[ed] to use the information in connection with a credit transaction involving the consumer" and there was "a legitimate business need," as permitted under the statute. *See* 15 U.S.C. §§ 1681(b)(a)(3)(A), (F).

Plaintiffs suggest that SoFi's argument ignores the allegations in the complaint. Plaintiffs allege that on June 19, 2020, Mr. Segarceanu uploaded a copy of the front and back of his green card as part of his loan application. FAC at ¶ 89. Plaintiffs further allege that this copy showed that the two-year validity period of the card ended on September 11, 2021. *Id.* Because SoFi had a policy that permanent residents were ineligible for loans if their green cards had a validity period of two years or less, *see id.* at ¶ 6, Plaintiffs allege that on June 19 SoFi knew or should have known that Mr. Segarceanu was facially ineligible under SoFi's lending policies, *id.* at ¶ 91. Nevertheless, SoFi pulled Mr. Segarceanu's credit report the next day, *id.*, and only afterward emailed him to ask for further information about the extension of his green card, *id* at ¶ 92. Plaintiffs conclude that there was no business need to pull Mr. Segarceanu's credit report because SoFi already had information—the copy of his green card—showing that he was ineligible. *See* Dkt. No. 41 at 15. SoFi responds that Mr. Segarceanu's eligibility was not determined until after he failed to provide SoFi with the additional Form I-751, which it requested on June 20, 2020. *See*

15

1  Dkt. No 43 at 11–13. SoFi further suggests that the fact that it requested this form at all indicates
2  that Mr. Segarceanu was not facially ineligible based on his application materials received at that
3  time. *See id.* at 12–13.
4        The parties appear to dispute SoFi's actual knowledge regarding Mr. Segarceanu's
5  ineligibility. But at this stage, the Court must accept as true Plaintiffs' well-pleaded factual
6  allegations. And the complaint alleges that SoFi had a copy of Mr. Segarceanu's green card
7  before it pulled his credit report; the green card indicated that it expired in less than two years; and
8  as a matter of USCIS policy, Mr. Segarceanu could not renew his green card at that time to extend
9  its validity period.[7] *See* FAC at ¶¶ 89, 92–93. The complaint further alleges that SoFi "had actual
10 knowledge that he was not eligible under its lending policies." *See id.* at ¶ 91. The Court finds
11 that Plaintiffs have therefore sufficiently alleged that Mr. Segarceanu's credit report could not
12 have been "in connection with a credit transaction involving the consumer" and there was not "a
13 legitimate business need" to obtain his credit report. *See* 15 U.S.C. §§ 1681(b)(a)(3)(A), (F). The
14 Court therefore denies SoFi's motion to dismiss the FCRA claim. Once the parties develop a
15 factual record in discovery, the Court can revisit this issue at a later stage as necessary.

## IV.   CONCLUSION

Accordingly, the Court **DENIES** SoFi's motion to compel arbitration and **GRANTS IN PART** and **DENIES IN PART** the motion to dismiss. The Court will grant Plaintiffs an opportunity to amend the complaint to address the deficiencies identified above as to the Unruh Civil Rights Act claim. Any amended complaint must be filed within 21 days of this order. The Court further **SETS** a telephonic case management conference on May 4, 2021, at 2:00 p.m. All parties, counsel, and members of the public and press may use the following dial-in information below to access the conference line:

   **Dial In:** 888-808-6929

   **Access Code:** 6064255

//

---

[7] The complaint alleges that USCIS rejects any Form I-751 application if it is filed more than ninety days before the date the conditional residence visa is set to expire. *See* FAC at ¶ 93.

The parties shall also file a joint case management statement by April 27, 2021, and must be prepared to discuss at the case management conference how to move this case forward efficiently.

**IT IS SO ORDERED.**

Dated: 4/12/2021

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge

17